AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Special Agent Brady O'Donnell, being duly sworn, depose and state that:

INTRODUCTION

1. I have been employed by the Drug Enforcement Administration ("DEA") since August of 2020. I am currently assigned to the New England Field Division, Task Force 5 as a Special Agent, where I am tasked to investigate Drug Trafficking Organizations and their ties to violent crime. I graduated from the DEA Basic Agent Training Academy in Quantico, Virginia in December of 2020, where I received specialized training in narcotics investigations and related legal matters. Prior to my employment as a Special Agent, I was employed as a regional development officer for DeliverFund, which is a private counter-human trafficking intelligence company. DeliverFund is based in Dallas, Texas and focuses on training state and local law enforcement in specialized counter-human trafficking investigative techniques. Before that, I completed a Graduate Degree in Public Affairs from Brown University in Providence, Rhode Island, where I focused on policy related to national security, public safety, and transnational criminal investigative models.

2. During my specialized training at the DEA Training Academy, I participated in numerous exercises to include the use of confidential informants, undercover operations, physical and electronic surveillance, telephone toll analysis, investigative interviews, and the execution of search and seizure warrants. In addition, I was further trained in specialized defensive tactics, firearms training, raid and entry tactics, judgmental shooting, and legal training.

3. I have participated in aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal

knowledge regarding major narcotics trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

4. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF THE AFFIDAVIT

5. I have personally been involved in the investigation of Dan Thanh NGUYEN ("NGUYEN") for: (a) the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to commit drug trafficking offenses, in violation of 21 U.S.C. § 846 ("Target Offenses").

6. This affidavit is being submitted in support of applications for warrants to search electronic equipment, specifically the following mobile phones, (collectively, "the Equipment") seized from NGUYEN on June 1, 2021, that are currently in the possession of law enforcement investigators, as described in Attachment A:

a. a silver iPhone 12, stored as DEA Exhibit N-6;

b. a white iPhone 8, stored as DEA Exhibit N-7;

c. a white iPhone X, stored as DEA Exhibit N-8; and

d. a white Samsung Galaxy, stored as DEA Exhibit N-9.

7. As detailed herein, there is probable cause to believe that the Equipment contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

8. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

*Drug Traffickers' Use of Cell Phones Generally*

9. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use cellphones to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; accessing personal accounts including banking information; paying for items; and creating and storing images and

3

videos of their movements and activities.

10. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. The mobile phones comprising the Equipment are all smartphones. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages, e-mails, and other electronic messages, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

11. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in smartphones.

12. Based on my knowledge, training and experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person 'deletes' a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a 'swap' or 'recovery' file.

   c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system

4

        configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or 'cache.'  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

*NGUYEN's Cell Phones*

13. On June 1, 2021, at approximately 11:00 a.m., investigators observed NGUYEN exit a residence located at 65 Newcomb Avenue, Randolph, Massachusetts.  NGUYEN retrieved a paper shopping bag from inside a pickup truck parked in the driveway and then entered a gray Ford Taurus, carrying the paper bag.

14. Investigators followed NGUYEN as he drove the Ford to 11A Baxter Avenue in Quincy, where NGUYEN entered the residence at approximately 11:33 a.m.  Approximately five minutes later, NGUYEN walked out of 11A Baxter Avenue, now carrying a large cardboard box, which he placed in the trunk of the Ford.  After returning briefly to the residence at 11A Baxter Avenue, NGUYEN entered the Ford and drove away.

15. At approximately 11:50 a.m., investigators executed a traffic stop of NGUYEN's Ford.  Investigators asked NGUYEN about the box they had observed him load into his trunk minutes earlier, and NGUYEN admitted that it contained marijuana he intended to sell and make money for himself.  Investigators asked NGUYEN for consent to search the Ford.  NGUYEN verbally consented to the search and opened the trunk of the Ford.  In the trunk of the Ford, investigators located the cardboard box NGUYEN had been seen carrying out of 11A Baxter Avenue.  Inside the box, investigators located approximately 20 pounds of suspected marijuana

5

packaged in 20 individually-packaged, vacuum-sealed plastic bags. Based on my training and experience, I believe the street value of 20 pounds of marijuana is approximately $40,000. On NGUYEN's person and the cab of the Ford, investigators located the four smartphones comprising the Equipment. Two of the phones had a tool hidden behind the phone case, which based on my training and experience, is a tool typically used to remove and replace SIM cards. Based on my training and experience, I know that drug traffickers often change SIM cards because allows them to easily interchange devices and telephone numbers to avoid detection by law enforcement.

16. NGUYEN told investigators that he was transporting the marijuana from 11A Baxter Avenue to 65 Newcomb Avenue, and that he had additional marijuana stored at both locations. Investigators requested consent from NGUYEN to search 65 Newcomb Avenue and 11A Baxter Avenue and NGUYEN provided written consent to search these locations.

17. Shortly thereafter, investigators executed consent searches at 65 Newcomb Avenue and 11A Baxter Avenue. Inside 65 Newcomb Avenue, investigators located approximately 69 pounds of suspected marijuana in vacuum-sealed bags, and approximately $6,681 in cash. Inside 11A Baxter Avenue, investigators located approximately 100 pounds of suspected marijuana also packaged in vacuum-sealed bags. The estimated street value of the marijuana seized from these two addresses is nearly $340,000.

18. Investigators requested consent to search the Equipment, which NGUYEN refused. NGUYEN told investigators that they would need to apply for search warrants in order to search the Equipment, however NGUYEN allowed investigators to seize the devices in order to obtain those warrants.

19. Based on the number of devices (4), the presence of two SIM card tools, and the fact that NGUYEN carried all four devices as he transported 20 pounds of suspected marijuana

between two residences at which he maintained hundreds of thousands of dollars' worth of marijuana, I believe that NGUYEN uses the Equipment in furtherance of his drug trafficking activities and that information contained on or within the Equipment will constitute or lead to evidence of the Target Offenses.

20. The Equipment is currently being stored by investigators at their facilities as described in Attachment A. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when it first came into the investigators' possession.

## CONCLUSION

21. Based on the information described above, there is probable cause to believe that NGUYEN has committed the Target Offenses and that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the Equipment described in Attachment A.

/s/ Brady O'Donnell
_____
Brady O'Donnell
DEA Special Agent

Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 this 11th day of June, 2021.

_____
HONORABLE M. PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

## ATTACHMENT A

### Description of Equipment to Be Searched

The Equipment to be searched consists of the following:

a. a Silver iPhone 12, stored as DEA Exhibit N-6;

b. a white iPhone 8, stored as DEA Exhibit N-7;

c. a white iPhone X, stored as DEA Exhibit N-8;

d. a white Samsung Galaxy, stored as DEA Exhibit N-9.

The Equipment is located at the offices of the Drug Enforcement Administration's Boston Office where investigators submitted the Equipment into the Overnight Non-Drug Evidence Locker for safekeeping.

**ATTACHMENT B**

**Items to Be Seized**

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of: (a) the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to commit drug trafficking offenses, in violation of 21 U.S.C. § 846 ("Target Offenses"), including those related to:

- A. The following individual and residential addresses:
    1. Dan Thanh NGUYEN;
    2. 65 Newcomb Avenue, Randolph, Massachusetts; and
    3. 11A Baxter Avenue, Quincy, Massachusetts.
- B. The payment, receipt, transfer, or storage of money or other things of value by NGUYEN, including:
    1. Bank, credit union, investment, money transfer, and other financial accounts;
    2. Credit and debit card accounts;
    3. Tax statements and returns;
    4. Business or personal expenses;
    5. Income, whether from wages or investments;
    6. Loans;
- C. The travel or whereabouts of NGUYEN leading up to the June 1, 2021 seizures of marijuana;

9

  D. The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

  E. Evidence of who used, owned, or controlled the Equipment;

  F. Evidence of malicious computer software that would allow others to control the Equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

  G. Evidence of the attachment of other hardware or storage media;

  H. Evidence of counter-forensic programs and associated data that are designed to eliminate data;

  I. Evidence of the times the Equipment was used;

  J. Passwords, encryption keys, and other access devices that may be necessary to access the Equipment;

  K. Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; and

  L. Records relating to the ownership, occupancy, or use of the location from which the Equipment was obtained by law enforcement investigators.

II. Serial numbers and any electronic identifiers that serve to identify the computer equipment.

**DEFINITIONS**

For the purpose of this warrant:

  A. "Equipment" means any hardware, software, storage media, and data.

  B. "Hardware" means any electronic device capable of data processing (such

     as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

 C. "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

 D. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

 E. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

 F. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or

11

instrumentalities of a crime, the Equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If Equipment cannot be returned, agents will make available to the Equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.